298 So.2d 391 (1974)
STATE of Florida, Petitioner,
v.
Sal AIUPPA, Respondent.
No. 44264.
Supreme Court of Florida.
May 1, 1974.
*392 Robert L. Shevin, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., for petitioner.
Tobias Simon and Elizabeth J. duFresne, Miami, for respondent.
DEKLE, Justice.
In accordance with Rule 4.6, Florida Appellate Rules, 32 F.S.A., the Honorable Robert J. Shingler, County Judge of the County Court for Pinellas County, has certified to this Court for instruction the question of law set forth below. The pertinent portion of the certificate as submitted to us reads as follows:
"STATEMENT OF FACTS
"This case is before the County Court for trial on direct information filed by the State Attorney charging the defendant, SAL AUIPPA, with violation of Chapter 73-120 Laws of Florida 1973 in the following language,
`... that SAL AUIPPA of the County of Pinellas and State of Florida, on the 5 day of July in the year of our Lord, one thousand nine hundred seventy-three, in the County and State aforesaid, did distribute obscene material by exhibiting to other persons a motion picture film entitled "Deep Throat," knowing the obscene nature thereof, said film considered as a whole, applying contemporary community standards, having its predominant appeal to the prurient interest, being utterly without redeeming social value, and going substantially beyond the customary limits of candor in representing nudity and sexual conduct in that said film graphically depicts and shows nude male and female persons actually engaging in sexual conduct including sexual intercourse, sodomy, cunnilingus, and fellatio, contrary to Chapter 73-120, Florida Statutes, and against the peace and dignity of the State of Florida.'
"The County Court stayed the proceedings to certify the questions of law to the Supreme Court of Florida for instruction pursuant to Florida Appellate Rule 4.6 [32 F.S.A.] which are determinative of the cause and for which the County Court believes are without controlling precedent to facilitate the proper disposition of said cause. The County Court on its own motion certifies the following:

"QUESTIONS OF LAW TO BE ANSWERED
"Whether the provisions of Chapter 73-120 Laws of Florida 1973,
`AN ACT relating to distribution of obscene materials; providing for the offense of distributing obscene material; providing definition of obscene *393 material; providing penalties; providing for the offense of wholesale promotion of obscene material; providing penalty; providing for offense of requiring purchasers to accept obscene materials as a condition to sale or delivery for resale of other materials; providing penalty; providing for prior adversary hearing where appropriate; abrogating county and municipal ordinances relating to obscene materials and in effect July 1, 1973; prohibiting county and municipal ordinances relating to obscene materials, providing a severability clause; providing an effective date.'
"A. is guided by insufficient and arbitrary standards which are vague, indefinite and uncertain so as to violate the First Amendment standard of the United States Constitution set forth in the decisions of the United States Supreme Court in the case of Miller v. California, 41 LW 4925, [413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419], and Paris Adult Theatre I v. Slaton, 41 LW 4935, [413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446], in specifically defining sexual conduct?
"B. still requires the State of Florida to prove that the material must be `utterly without redeeming social value' or in light of the decisions of the Supreme Court of the United States in Miller v. California, 41 LW 4925, [413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419], and Paris Adult Theatre I v. Slaton, 41 LW 4935, [413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446], rejecting same as a constitutional standard only the United States Supreme Court's rephrasing requiring that the work, taken as a whole, must be proved to lack `serious literary, artistic, political or scientific value,' or both standards?
"C. is unconstitutionally vague in violation of the due process clause and equal protection guaranteed by the Constitution of the United States and of the State of Florida because a trial judge cannot determine what specifically defined sexual conduct is embodied with the definition of obscene material as written in Chapter 73-120 in order to properly instruct a jury and conduct a trial under the requirements set forth by the United States Supreme Court in the cases of Miller v. California, 41 LW 4925, [413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419] and Paris Adult Theatre I v. Slaton, 41 LW 4935, [413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446]."
A question or proposition certified directly to this Court by a county court must be one which, if decided by the county court, would be reviewable on direct appeal from that court to this Court. Jaworski v. City of Opa-Locka, 149 So.2d 33 (Fla. 1963). If this cause proceeded to final judgment the trial court would, of necessity, pass upon the constitutional validity of a state statute. An appeal would then lie directly to this Court. Fla. Const., Art. V, § 3(b)(1), F.S.A. We therefore have jurisdiction and may answer the questions certified by the trial judge. We consider here only the constitutionality of the statute vel non, which is the manner in which it has been submitted, and not as applied to any particular factual situation. Neither is Fla. Stat. Ch. 73-120, § 1(3), involved here; it provides that material not otherwise obscene may be deemed obscene if the distribution of the material in question is a commercial exploitation of erotica solely for the sake of their prurient appeal. However, inasmuch as the instant case does not involve any "pandering," we need not discuss the constitutionality of § 1(3) of Ch. 73-120.

A. and C. "VAGUENESS and DUE PROCESS"
Ch. 73-120 states that material is obscene "if considered as a whole, applying community standards, its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion and utterly without redeeming social value and if, in addition, it goes substantially beyond customary limits of candor *394 in describing or representing such matters." The wording of the statute is substantially the same as the Georgia statute in Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).
Upon return of Slaton for reconsideration, the Supreme Court of Georgia in Slaton v. Paris Adult Theatre I, 231 Ga. 312, 201 S.E.2d 456 (1973), upheld the constitutionality of Ga. Code Ann. § 26-2101, after which the Florida statute under consideration was fashioned. The Georgia court cited its "authoritative constructions" in earlier decisions involving the statute to support the requirement for statutory definitions of obscenity.[1] Those earlier interpretations were held to supply the required specificity in the present statutory phraseology under consideration. The prior authoritative constructions were also held to have avoided an unconstitutional retroactive judicial construction of the statute, thereby preventing a violation of the due process clause. Florida does not enjoy such earlier interpretations of this statute upon which to rely but we do find the statutory language sufficient.
Ch. 73-120 was patterned after the substantially identical provision found in 26 Ga. Code Ann. § 2101(b). Where this occurs it is proper to resort to judicial constructions placed on the statute by the courts of the state whose statute provided the "model" in determining the proper construction of our own statute. Gay v. Inter-County Tel. & Tel. Co., 60 So.2d 22 (Fla. 1952); Denmark v. Ridgell Furniture Co., 117 Fla. 244, 157 So. 489 (1934); Venice East, Inc. v. Manno, 186 So.2d 71 (Fla.App.2d 1966). If a Florida statute is patterned after a statute of a sister state, it is amendable to the same construction that its prototype has been given in the sister state. Flammer v. Patton, 245 So.2d 854 (Fla. 1971); Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 So. 761 (1907).
Statutes adopted from another state may be deemed to have been adopted with the construction given to them by the courts of the state from which they were adopted. State ex rel. Porter v. Atkinson, 108 Fla. 325, 146 So. 581 (1933). A statute adopted from another state is governed by the construction placed upon it, at the time of its enactment, by the highest court of the state from which the statute was adopted. Crane Co. v. Richardson Constr. Co., 312 F.2d 269 (CA 5, 1963). Thus, in construing Ch. 73-120 to determine whether it meets the "specificity" test set forth in Miller, we may properly resort to interpretations of 26 Ga. Code Ann. § 2101(b) by the Supreme Court of Georgia, which is the highest court of the state from which our statute was adopted, prior to the date on which Ch. 73-120 was enacted.
As was noted by the Supreme Court of Georgia in Slaton v. Paris Adult Theatre I, 231 Ga. 312, 201 S.E.2d 456 (1973), the provisions of 26 Ga. Code Ann. § 2101(b) have been authoritatively construed in such a manner as to meet the "specificity" test set forth in Miller. The cases relied upon in Slaton to support such determination are Evans Theatre Corp. v. Slaton, 227 Ga. 377, 180 S.E.2d 712 (1971) (dealing with "acts of sexual intercourse, natural, unnatural, bizzare, and violent"); Walter v. Slaton, 227 Ga. 676, 182 S.E.2d 464 (1971) ("actual sexual activity, both natural and unnatural," including sexual intercourse, fellatio and cunnilingus); 1024 Peachtree Corp. v. Slaton, 228 Ga. 102, 184 S.E.2d 144 (1971) (similar description of the material involved); and Slaton v. Paris Adult Theatre I, 228 Ga. 343, 185 S.E.2d 768 (1971) (simulated sexual activity including portrayal of sexual intercourse and fellatio). All of these authoritative constructions of the Georgia statute, it will be noted, were handed down in 1971, well before the date upon which Ch. 73-120 was enacted.[2] Accordingly, the proper construction of Fla. Stat. Ch. 73-120 should follow the *395 construction placed upon the Georgia statute which was its prototype by the highest court of Georgia. As did the Supreme Court of Georgia in Slaton v. Paris Adult Theatre I, 231 Ga. 312, 201 S.E.2d 456 (1973), we hold that the statute meets the requirements set forth in Miller. In addition to the delineation contained in the statute itself, as hereinafter set forth, these authoritative constructions specifically delineate the field of operation of Ch. 73-120 in a manner consistent with the new Miller standards.
We do not extend ex post facto application to such Georgia "authoritative constructions" as binding "notice" to an offender of what conduct is prohibited; only our own constructions are binding as such notice in Florida. Miller. In this respect we stand on our direct holding which follows that the statutory language is sufficient for such purpose of notice. These Georgia holdings on a like statute, however, are supportive of our present like interpretation and, being before the Legislature in its adoption of such statute, as reflecting the legislative intent thereof.
The United States Supreme Court, in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), has set forth the test to be used to separate the unprotected obscene from materials protected under the First Amendment (and, as to the states, under the Fourteenth Amendment). As stated in that opinion:
"The basic guidelines for the trier of fact must be: (a) whether `the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, [cites omitted], (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2615, 37 L.Ed.2d at 431.
The U.S. Supreme Court in explaining in Miller what was intended by "specifically defined" by state law, gave the following examples:
"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." 413 U.S. at 25, 93 S.Ct. at 2615, 37 L.Ed.2d at 431.
As further examples of "state laws directed at depiction of defined physical conduct, as opposed to expression,"[3] the Court in Miller pointed to specific statutes of Oregon and Hawaii which prohibit specifically designated anatomical areas and specifically designated sexual activities from being depicted in such a manner as to appeal to the prurient interest, etc.
Our recent decision in Davison v. State, 288 So.2d 483 (Fla. 1973), held that Fla. Stat. § 847.013, F.S.A., met the "specific definition" requirements of Miller on its face, in that it specifically defined, in terms of physical condition rather than in terms of expression, the statutory meaning of "nudity," "sexual conduct," "sexual excitement," and "sadomasochistic abuse." The term "harmful to minors" is then defined in that statute to mean descriptions or exhibitions of these defined types of "sexual conduct" when predominantly appealing to the prurient interest, patently offensive to prevailing community standards, and utterly without redeeming social value.
As noted above, Miller requires that in order for a state to regulate obscene materials, the state statute must specifically define sexual conduct deemed obscene, as *396 may be bolstered by earlier "authoritative constructions" thereof which do so and thereby place an offender on prior notice of the conduct proscribed. We must determine here whether or not Ch. 73-120, Laws of Florida, on its face "specifically defines" sexual conduct. There have been no prior "authoritative constructions" of this statute upon which to lean.
The asserted doubt concerning the validity of the statutory definition lies in its seemingly defining obscene materials in terms of a mere "interest" as opposed to the depiction or description of sexual "conduct." The obscenity is described but as an "interest" in such sexual conduct. The statutory definition states:
"Material is obscene if ... its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion... ."
The conditional or adverbial clause clearly modifies the predicate adjective "obscene" which is equated to the subject of the sentence "material" by a copulative verb. At this point, the statute speaks of that which is obscene as that which appeals to prurient interest, and that which appeals to prurient interest is modified by its appositive, "a shameful or morbid interest in nudity, sex or excretion." While these words literally indicate a type of "interest" in specific sexual conduct, nevertheless, the intent and purpose is clear, that these constitute the prohibited "conduct" which is deemed to be obscene. Otherwise, it is of little purpose to view such conduct as a mere "interest."
It is a fundamental principle that this Court has the duty, if reasonably possible, to resolve all doubts concerning the validity of a statute in favor of its constitutionality.[4] As well, it is our duty when construing a statute to ascertain legislative intention and to effectuate it.[5]
The intent of the legislature to regulate the depiction or description of sexual conduct is manifest from the undeniable fact that sexual conduct is the keystone of obscenity. The title of the act reads: "An Act relating to the distribution of obscene materials." It is the fruit of plain common sense that we hold that this statute defines the sexual conduct deemed obscene. We refuse to permit grammatical niceties to frustrate our duty to effectuate legislative intent. We, therefore, conclude that this is the only reasonable construction which is consistent with legislative intent.
The information filed against the defendant in this case charges him with showing a film which,
"... graphically depicts and shows nude male and female persons actually engaging in sexual conduct including sexual intercourse, sodomy, cunnilingus, and fellatio... ."
The statutory definition, as we construe it, specifically defines the sexual conduct ("interest") which renders materials obscene as "shameful or morbid nudity, sex or excretion." The acts which the information charges that the film depicts are those which the definition contemplates. The statute states "sex" which, in the statutory context, of course means sexual intercourse, or interplay, this being the indisputable basis of this obscenity matter. The statute states "shameful or morbid" and, as construed, these words modify "nudity" and "sex." We hold these to include cunnilingus, sodomy and fellatio, as charged in *397 the information, for these acts render nudity and sex shameful or morbid.
We recognize the ease with which we might dispose of these distasteful cases by merely construing this statute to encompass the definition suggested by the Supreme Court of the United States in Miller. However, we feel that such a construction would usurp the power of the Legislature to enact statutes, a power which is vested solely therein by the Constitution of the State of Florida.[6] Our construction is consistent with common sense and legislative intent, and we will not, in effect, rewrite this statute by incorporation of the definition offered by the Supreme Court of the United States.[7] Any amendments we leave to the Legislature.
In State v. J-R Distributors, Inc.,[8] the Supreme Court of the State of Washington upheld a statute which only prohibited the distribution of that "which is obscene."[9] Our statute is clearly more specific than the statute upheld by the Washington Court.

B. "VALUE OF THE WORK"
In rejecting as a constitutional standard the previous obscenity test of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), the Supreme Court has lessened the burden of the State as to the "value of the work" element of the obscenity test and at the same time has required that obscenity statutes meet a more rigorous test of specificity than was previously imposed.
With respect to the question as to whether Ch. 73-120 still requires a showing that the offending material is "utterly without redeeming social value" or merely that it is without "serious literary, artistic, political, or scientific value" (the "value of the work" test set forth in Miller), we hold that the statute must be followed until changed, and it requires a showing that the work is "utterly without redeeming social value." As the State wisely and forth-rightly concedes, the Supreme Court in Miller did not find that test to be unconstitutional, but rather found that a less stringent (from the viewpoint of the prosecution) test was constitutionally permissible. The "value of the work" test of Miller is merely a minimal guideline; that is, the offending material must be without serious literary, etc., value before it can be deemed obscene, but the states may require that the work be shown to have even less value than this before it can be deemed obscene. This is precisely what the statute in question does. Even though Florida could enact a statute embodying the serious literary, etc., value test of Miller, it may go beyond this minimal guideline and embody a requirement that the offending material be "utterly without redeeming social value" in order to be deemed obscene; Ch. 73-120 does so, and the specific statutory requirements in this area, not being unconstitutional, remain the applicable test under Ch. 73-120.
Accordingly, we answer the questions certified to us as follows:
A. The definition of what material is obscene found in § 1(2) of Ch. 73-120, Laws of Florida, 1973, is sufficient in its terms, to meet the First Amendment standards set forth in Miller v. California, supra, and Paris Adult Theatre I v. Slaton, supra, as to specifically defining sexual conduct.
B. Ch. 73-120 requires the State of Florida, when employing this alternative statute, to prove that the offending material is "utterly without redeeming social value" regardless of the decisions in Miller and Paris Adult Theatre, since this is the *398 express provision of the statute, until amended.
C. Ch. 73-120 does set forth what specifically defined sexual conduct is embodied within its prohibitory provisions on its face; further, such defined conduct as now herein authoritatively construed will hereafter additionally support the requirement of defined conduct as to future offenses, in accordance with the decisions of the United States Supreme Court in Miller v. California, and Paris Adult Theatre I v. Slaton, supra. Thus F.S. Ch. 73-120 does not violate the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.
The certified questions having been answered, the stay of the prosecution entered by the trial judge should be dissolved and the cause proceed in accordance herewith.
It is so ordered.
ROBERTS, BOYD, McCAIN and CARLTON (Retired), JJ., concur.
ERVIN, J., dissents with opinion in which ADKINS, C.J., concurs.
ERVIN, Justice (dissenting):
A perplexed and sorely concerned trial judge in conscientiously attempting to carry out his constitutional duties seeks in these proceedings our advice, whether Ch. 73-120, Laws of Florida, enacted prior to the time Miller v. California (1973) 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, and Paris Adult Theatre I v. Slaton (1973), 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446, were decided, conforms to the guidelines of those cases. I find Ch. 73-120 is directly and facially in conflict with the guidelines of those cases.
The critical language of Ch. 73-120 that is relevant to the trial judge's inquiry reads as follows:
"Section 1. (1) A person commits the offense of distributing obscene materials when he sells, rents, leases, advertises, publishes, exhibits or otherwise disseminates to any person any obscene material of any description, knowing the obscene nature thereof, or who offers to do so, or who possesses such material with the intent to do so.
"(2) Material is obscene if considered as a whole, applying community standards, its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and utterly without redeeming social value and if, in addition, it goes substantially beyond customary limits of candor in describing or representing such matters.
"(3) Material, not otherwise obscene, may be deemed obscene under this section if the distribution thereof, or the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of their prurient appeal.
"(4)(a) Whoever distributes obscene materials is guilty, upon first conviction, of a misdemeanor of the first degree, punishable as provided in Sec. 775.082, Florida Statutes, or by a fine to not exceed $5,000." (Emphasis supplied)
Miller v. California (1973) 413 U.S. 15, 93 S.Ct. 2067, 37 L.Ed.2d 419, and Paris Adult Theatre I v. Slaton (1973) 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446, undertook to reaffirm in part and refine the obscenity regulatory criteria of Roth v. United States (1957) 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, and Memoirs v. Massachusetts (1966) 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1, for the constitutional guidance of the state legislatures.
Justice Brennan candidly admits in dissent in Paris Adult Theatre that the Court's many prior efforts in which he took a prominent part to provide guidelines for the regulation of obscenity within the First Amendment had failed because the *399 Court was "unable to provide `sensitive tools' to separate obscenity from other sexually oriented but constitutionally protected speech ..." and that "outright suppression of obscenity cannot be reconciled with the fundamental principles of the First and Fourteenth Amendments".
He said attempts to define obscenity inevitably involve the use of vague terms and that they fail to give fair notice and have a potentially chilling effect on protected expression dealing with sexual matters. Regularity and predictability is thereby made impossible in lower court decisions.
The majority of the United States Supreme Court in Miller and in Paris Adult, in contrast to Justice Brennan's candid admission of the inability of the Court to constitutionally provide formulaes for the regulation of obscenity, held that "hard core" pornography is not entitled to First Amendment protection because it is "utterly without redeeming social importance". Proceeding on that basic assumption, the Court then told the state legislatures how they could legally suppress that type of obscenity. It prescribed for them guidelines for future legislation to regulate what it termed "hard core pornography" or obscene material:
"(a) Patently offensive representation or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibitions of the genitals." (Emphasis supplied)
In addition to its advisory opinion for new state legislation, the Court requires the trier of facts to consider:
"(a) whether `the average person, applying ... community standards' would find that the work, taken as a whole, appeals to the prurient interest ...
"(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and
"(c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." (Emphasis supplied)
The Court majority said a legislature could legitimately act "... to protect the `social interest in order and morality'". It concluded states can regulate obscenity on the assumption that exposure to obscene materials would produce antisocial behavior. The majority claimed that those holding an "absolutist view of the First Amendment" could not explain why restraint of First Amendment rights is permissible in a commercial setting (federal securities regulation and antitrust laws and other laws in the commercial regulatory field) but not in "the market place of pornography". The majority rejected the idea that government cannot "impede" an individual's desire to see or acquire obscene works, noting that such desire "is not conducive to an `ordered society' nor can the rights of the weak, uninformed, unsuspecting, or gullible members of a society be protected without restrictions". The majority appeared moralistically concerned with the "tone and quality of life in society" and the need to foster respect for a "sensitive, key relationship of human existence, central to family life" which is "debased and distorted by crass commercial exploitation of sex".
These philosophically divergent views of the members of the nation's high Court are outlined as an explanatory prelude to the conclusions drawn herein and to point up the fact that censorship of pornography exudes overtones of governmental interference with individual liberty in the effort to legislate morals, and that regulatory acts for such purposes must be closely scrutinized and strictly construed.
Several peripheral problems have arisen in the aftermath of these new decisions purporting to guide the states in providing constitutional regulation of obscenity, *400 among which are: effect on privacy in the home (compare Stanley v. Georgia (1969) 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542), balancing of social value and harm (compare Chaplinsky v. New Hampshire (1942) 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031), implementation of local standards rather than national standards (compare Jacobellis v. Ohio (1964) 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793), the unnecessity of any evidence than the work or material itself for a jury to determine obscenity or the presence of "serious literary or artistic values" (compare Memoirs v. Massachusetts, supra, and Kaplan v. California (1973), 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492). These related subjects and others have been extensively discussed by text writers and in lower court decisions in the resulting aftermath of Miller and Paris Adult Theatre. E.g., see Harvard Law Review, Vol. 87:1, page 160 et seq.
The critical inquiry in the discussions succeeding Miller is whether the new criteria strike a reasonable balance between First Amendment rights and the legitimate suppression of obscenity. Many thoughtful persons conclude that extreme "law and order" notions to promote "morality and decency" have entered into the obscenity regulatory efforts bringing them beyond reasonable constitutional limits.
Much more could be said generally upon this controversial subject explicating the erratic confusion that has been generated; the intractableness of the problem; the serious threat posed to constitutional liberties by this renewed Twentieth Century Comstockian effort to suppress "obscenity", and the history of prudery, fanaticism, inquisition and suppression generated in the name of social or religious morality extending from earliest times  all of which in time invariably failed in their objectives to suppress human expression of ideas. But to what avail to say more here? At this stage of immaturity our civilization is not ready in this area to eschew age-old "morality" suppression methods in favor of an enlightened policy that respects the ability and responsibility of the adult citizen to regulate his social conduct within the acceptable limits of human dignity.
It suffices to pass on to the specific questions certified and to answer them in the light of the present status of the law.
The critical language of Ch. 73-120 may have conceivably met the tests of Roth and Memoirs, but certainly not of the revised ones in Miller and Paris Adult Theatre. The California definition of obscenity under which Miller was charged is substantially similar to that of Ch. 73-120. The three-pronged test of Roth-Memoirs was the California statute's progenitor. Miller's conviction was reversed by the Supreme Court of the United States, which said:
"State statutes designed to regulate obscene materials must be carefully limited... . As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed." (Emphasis supplied)
Miller's case was remanded to be reconsidered in light of the revised tests.
Ch. 73-120 became law on June 7, 1973, prior to the rendition of Miller and Paris Adult Theatre decisions on June 21, 1973. California's statute on obscenity was revised and re-enacted in the light of Miller. Florida's Ch. 73-120 has not been so revised and re-enacted. Florida's Ch. 73-120, like California's pre-Miller statute, does not specifically define or describe the "hard core pornography" sexual conduct, depiction of which the information charges that the defendant, Aiuppa, exhibited by showing the movie "Deep Throat". In other words, the statute does not, as Miller requires, prohibit commercial exhibition of specifically depicted or described "hard core pornography" conduct in the form of sexual intercourse, sodomy, cunnilingus and fellatio that are charged in the information to Aiuppa.
*401 The generalized, abstract language of Ch. 73-120 following the Roth-Memoirs formula does not undertake to define any specific sexual conduct of the hard core pornography variety, the depiction of which Miller holds is unprotected by the First Amendment. Instead it attempts to define obscenity generally, not specifically. It uses the contingent and supposing word, "if", leaving to the subjective determination of prosecutors and juries alike whether statutorily uncondemned and unspecified and undescribed sexual conduct or acts depicted in a particular work or material is pornographic because its "predominant appeal is to prurient interests". Abstract descriptive language is employed, e.g., "shameful or morbid interest in nudity, sex or excretion, and utterly without redeeming social value" which interest goes beyond "customary limits of candor" instead of the positive prohibition of specifically described hard core pornography sexual conduct commercially exploited as is charged in the Aiuppa information.
Ch. 73-120, because of its nebulous language, clearly leaves the determination of what specifically depicted pornographic conduct is banned to the subjective opinions of the prosecutor and the trier of facts. Instead of positively and specifically identifying the sexual conduct condemned, the legislature in effect has prescribed the subjective personal standard of the official beholder to evaluate each work or material brought under prosecutorial challenge, quite contrary to the explicit guideline of Miller and Paris Adult Theatre that the state statute specifically describe the pornographic conduct intended to be prohibited.
Actually it is not necessary to go further than the majority decisions in Miller and Paris Adult Theatre to demonstrate that the crucial language in Ch. 73-120 is void for vagueness. As before stated, the language is abstract, covers a wide, uncertain range, leaving to the subjective judgment of an official beholder and his bias whether a particular work is obscene.
Vague, undefined community standards are prescribed as one of the criteria for the beholder of the work to apply in making his accusatorial judgment. Determination of the prurient appeal of a work is not confined to specifically described obscene pornographic conduct in the statute as Miller requires, but is left to the beholder's subjective evaluation.
Aiuppa cites many of this Court's recent cases to substantiate his view that we should advise the trial judge Ch. 73-120 is unconstitutional for vagueness, including Franklin v. State (1971) 257 So.2d 21, voiding the state's sodomy statute, and State v. Barquet (1972) 262 So.2d 431 voiding a state statute prohibiting certain abortions. In the case of In re Fuller (1971) 255 So.2d 1, there are cited several decisions of the nation's highest Court striking down statutes for vagueness and overbreadth. It is hardly necessary to extend this dissent with a re-enumeration of those cases or citations therefrom. Justice Brennan in his dissent in Paris Adult Theatre refers to numerous cases striking down regulations for vagueness.
The Supreme Court of the United States in the recent cases of Papachristou v. City of Jacksonville (1972) 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110, and Smith v. Florida (1972) 405 U.S. 172, 92 S.Ct. 848, 31 L.Ed.2d 122, invalidated vagrancy regulations and in doing so gave renewed emphasis to the principle vague laws are unconstitutional for failing to give fair advance notice thus allowing public officers unreasonable latitude in suppressing personal conduct. The United States Supreme Court in Miller and Paris Adult Theatre, held that criminal statutes are to be strictly construed and should describe with precision and specificity the particular conduct prohibited in order to provide due process. Especially is this essential in regulations that trench upon freedom of speech and provide machinery for censorship.
The Miller court no longer requires that material be "utterly without redeeming social *402 value" before being prohibited as obscene. However, it is re-emphasized that the Court requires that a state obscenity law must "specifically define" the pornographic sexual conduct the depiction or description of which is to be proscribed. Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973). The Court made it clear that only works depicting or describing pornographic sexual conduct are within the scope of state regulation. Id. at 2614-2615. This relaxing of the Roth-Memoirs test as to social value is yet another constitutional reason for requiring statutory specificity of the proscribed conduct depicted since the relaxation makes for further uncertainty in the absence of specific definition.
Ch. 73-120 does not limit regulation (proscription) to depictions or descriptions of sexual conduct. The statute covers any material appealing to the prurient interest. Thus the statute is void for overbreadth, since it applies to protected materials as well as nonprotected works. Both hard core pornography and works sexually oriented are caught in the Act's net. The majority opinion vainly tries to demonstrate that the intent of Ch. 73-120 is only to regulate sexual conduct. After going through grammatical gyrations, the Court admits that the literal words of the statute speak to "interest" with no mention of what conduct, sexual or otherwise. The Court, however, concludes that the intent and purpose of the statute clearly is to prohibit conduct deemed sexually obscene. While courts may authoritatively interpret laws, there must be appropriate statutory language to justify a particular interpretation. There is no license in courts to amend statutes legislatively under the guise of interpretation. Particularly in this instance there is no justification for the majority to provide an obscene material definition which Miller says the legislature must provide, i.e., "sexual conduct specifically defined by applicable state law". Moreover, there is no basis in this instance for providing a judicial definition which is flatly at odds with the language of the statute.
It is difficult to understand the majority's reasoning since it appears that the result is that suddenly "a shameful or morbid interest in nudity, sex or excretion" is to be equated with explicitly proscribed and described sexual conduct. The only basis for this result is the majority's ipse dixit that "[o]therwise, it is of little purpose to view such conduct as a mere `interest.'"
The logic in this conclusion is elusive.
Particularly in this inquiry there is no justification for the majority out of the "whole cloth" to provide pornography definitions which Miller says the legislature must provide. The majority does not seem to be overly concerned with the legislative intent as expressed in the statute; but only to contort it into a Miller mold. Knowing that only descriptions of sexual conduct can lawfully be regulated, the majority has determined to rewrite the statute and to confine regulation to descriptions of sexual conduct. What the majority is saying is that any attempt to regulate materials other than those depicting sexual conduct conflicts with the First Amendment; therefore, the legislature must only have intended to regulate materials depicting sexual conduct. Such reasoning in view of the plain language of Ch. 73-120 seeks to adopt the Miller tests after the fact and violates the judicial duty to declare acts void which are clearly overbroad, and also usurps the legislative power, since the Court has molded the statute to fit tests with which the language of the statute is in direct facial conflict. Such violence to the principles of statutory construction was never intended by Miller to be an "authoritatively construed" definition of obscene conduct.
The Supreme Court of the United States in Miller-Paris Adult Theatre has advised the state legislatures they can pass obscenity laws prohibiting depiction of only specifically described sexual conduct, but concomitantly they must delegate to juries the *403 power to veto the application of such laws to such works where juries find such works do not affront local community standards. Parenthetically, such legislatively delegated authority to juries to override or substitute their judgment for the determinations of the legislature is hitherto unknown. Ch. 73-120 includes in its abstract description of obscene material the kind which it states is contrary to community standards. Miller speaks of a jury's authority to veto or suspend as to a particular work the statutory prohibition as not affronting community standards, while Ch. 73-120 speaks not of the authority of the trier of fact to lift the obscenity prohibition as to a particular work, but includes in its abstract definition of obscene material the element of community standards. Therein lies further great evidence of the vagueness and uncertainty of Ch. 73-120. Miller left the matter of applying community standards to the jury. It was not to be a factor in a state law specifically defining obscene sexual material. This point escapes the majority in its effort to place the mask of Miller on Ch. 73-120.
In Florida the task of weeding out obscenity has been exceedingly ineluctable. Juries in Jacksonville and Key West, Florida, have rendered verdicts that the movie "Deep Throat" does not offend local standards. Other trial courts have held provisions of the state obscenity acts void for vagueness and overbreadth or, as in this case, have refused to enforce such acts until an authoritative opinion on their constitutionality has been rendered by this Court. In a Dade County case, State v. Walvick Theatre Corp., et al., No. 73-22063, Circuit Judge Grossman recently held that Florida Statute 847.011, another of the state's obscenity statutes, could not be used to enjoin the movie "The Devil in Miss Jones" because criminal prosecution as well as the injunction proceeding had been instituted against the theater. A jury verdict of not guilty of a Dade County jury had been previously rendered in favor of the theater owner charged with showing the movie. In holding that the attempted duplicating injunction effort amounted to double jeopardy, Judge Grossman commented:
"The Court takes judicial notice of the fact that five other cases involving the same entitled film, "THE DEVIL IN MISS JONES," but with different corporate and individual defendants are presently the subject of litigation in this Circuit Court under Florida Statute 847.011 [F.S.A.]. A determination either for or against the obscenity vel non of the film in any one of these cases is not binding on any other Court under Florida Statute 847.011 [F.S.A.] nor is it conclusive as to any party other than those who are proper parties to that litigation. Thus, individual and corporate defendants under this statute have no constitutional protection under due process of law since the litigation against them could be duplicitous, and as to the film, potentially endless.
"The State has insistently argued that this Court should miraculously provide an interpretive gloss which would salvage the remnants of this statute. Such a feat would neither be proper nor actually an interpretation. It would amount to rewriting the statute in terms never envisioned by the enacting legislature. This is not the role of the Courts.
"It is one thing for the Courts to interpret a statute which clearly delineates criminal behavior and quite another for them to formulate the elements of a crime from a statute which is unconstitutionally vague. It has always been the sole prerogative of the Legislative Branch to enact law; and Courts have frequently held that they are powerless to construe a statute to save it from its own vagueness.
"Courts cannot go beyond the terms of the statute; they have no power of legislation. Courts have no power to make laws. Doe ex. den. Poor v. Considine, 6 Wall. 458, 18 L.Ed. 869 (1867); Del Monte M & M Company v. Last Chance M & M Company, 171 U.S. 55, 18 S.Ct. 895, 43 L.Ed. 72 (1898).

*404 "As the Court in International Bank v. Sherman, 101 U.S. 403, 25 L.Ed. 866 (1879), held, it is the business of the Courts to execute the law as they find it and not to make or modify it by interpolating qualifications which do not appear in the law itself. It is a firmly established rule that `Courts must apply a statute as they find it, leaving to the legislature the correction of assorted inconsistences and inequalities in its operation' at 530. McClain v. Commissioner of Internal Revenue, 311 U.S. 527, 61 S.Ct. 373, 85 L.Ed. 319 (1940).
"The Legislature, if it should desire, may properly legislate against the exhibition and sale of obscene materials not protected by the First Amendment and should do so against the materials themselves in an in rem proceeding or in the alternative, protect the individual defendants in an in personam proceeding in favor of their constitutional safeguards of due process of law."
Inasmuch as the Supreme Court of the United States recently granted review of a Georgia Supreme Court decision, No. 73-557, Jenkins v. Georgia, to determine if the Georgia statute which embodies a definition of obscenity taken from the Roth-Memoirs test was validly used to prohibit exhibition of the movie "Carnal Knowledge", it is possible the nation's high Court will re-evaluate its obscenity tests in the light of the growing problems arising under Miller-Paris Adult Theatre. Judge Grossman's views have distinct merit which commend them to the Supreme Court when it considers Jenkins v. Georgia.
It may be worthy of consideration in the light of the aftermath of Miller-Paris Adult Theatre for the Supreme Court of the United States in Jenkins to re-evaluate its holding in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, that a statute providing for both criminal and injunction proceedings against obscene materials is valid.
If we are to have governmental suppression of "obscenity" with the avoidance of implications of prior restraint or censorship and chilling effects on protected speech although sexually oriented, it would be the better part of judicial wisdom to decriminalize the process and restrict such suppression to civil injunction processes, eliminating criminal laws as too blunt and insensitive tools. And if such injunction proceedings were allowed to be brought only by carefully selected and qualified official review boards, fairer due process procedures could be afforded alleged culprits in lieu of the present "shot-gun" approach which permits prosecutors and triers, the unqualified "Tom, Dick and Harry" censors to get into the criminal prosecution and conviction act. Under the injunction process reasonable standards of greater specificity having some logical relation to a literary, artistic and scientific determination of the fine line between pornography and allowable art or expression could be gradually evolved as well as the conditions under which materials could be depicted or exhibited.
Determination of whether particular materials or works and the manner in which and to whom they are to be depicted or exhibited are within the protection of the First Amendment could be better ascertained by the injunction process. Existing criminal law permits of no such careful evaluation or evolution of value standards by recognized experts. It is now raw suppression under present guidelines depending largely upon the bias of the unsophisticated. Some obscenity regulation system having a degree of national acceptance as a viable system needs to be evolved, otherwise we will continue to have an uncoordinated and diffused mess. In Florida a modified version of Florida Statute 847.011, incorporating the Miller and Paris Adult Theatre criteria, and eliminating the criminal sanctions, but retaining the civil proceedings for confiscation and injunction, might possibly satisfy First Amendment and due process rights if it is restricted in its application to non-consenting *405 adults and juveniles. This procedure would insure prior hearings determining in advance if the work or material was obscene to particular classes of viewers under the Miller and Paris Adult Theatre criteria before its suppression or confiscation. Under our rules of equity practice the trial judge could impanel a jury if he deemed it appropriate, to make a determination if the work or material was obscene under "contemporary community standards". Such civil injunction procedures would go a long way to avoid the chilling effect of criminal sanctions upon protected First Amendment rights. They would provide orderly selective actions primarily directed against the work or material rather than in personam criminal actions posing threat to individual liberty.
After all, we have a national Bill of Rights that includes a First Amendment. There will continue to be such burnings as the one in Drake, North Dakota, of the book, "Slaughterhouse Five" by Kurt Vonnegut, while juries in Jacksonville, Miami and Key West, Florida, will allow "Deep Throat" and "The Devil in Miss Jones" to be exhibited under the present criteria unless we have a degree of national standards particularly for materials moving in interstate commerce. See Univ. of Florida Law Review, Vol. XXVI, Winter 1974 pages 324, et seq.
While I am not clairvoyant enough to read the future, I think that in view of the United States Supreme Court's willingness to review Jenkins v. Georgia this Court ought to await the decision in that case before upholding Ch. 73-120. I held a similar view in Davison v. State (Fla. 1971) 251 So.2d 841, text 847. Likewise in this case there is no need to be precipitate. Apparently the Supreme Court of the United States with the experience gained is not so stubbornly intransigent as to refuse to cope with the obscenity problem in terms of reality. Not being angels, we on this Court have little reason to rush ahead and possibly do a constitutional injustice to the accused, particularly since our statute, Ch. 73-120, is a Roth-Memoirs progeny and was not redrafted to conform to Miller-Paris Adult Theatre tests.
Unseemingly haste to approve most any act against obscenity and rewrite it by judicial construction to conform to each new utterance of the nation's highest Court without bowing to our Legislature's power to make amendments hardly comports with the role of a deliberate Court, conscientiously concerned with constitutional principles. For example, scan the "hurrahing" language used in the majority's conclusion in Rhodes v. State, 283 So.2d 351 (Fla. 1973). My two dissents in Davison v. State, 251 So.2d 841, and on remand, opinion filed December 20, 1973, further explicate my reasons for leaving obscenity to the more expert handling of the Supreme Court of the United States  and, of course, within its time schedule.
I would answer the three certified questions as follows: A in the affirmative; B, Ch. 73-120 by its express language in Section 1(2) requires the state to prove a material is "utterly without redeeming social value", and C in the affirmative.
ADKINS, C.J., concurs.
NOTES
[1] Miller v. Califorina, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, 430 (1973).
[2] The U.S. Supreme Court has noted probable jurisdiction in the case of Jenkins v. Georgia, Case No. 73-557, 414 U.S. 1090, 94 S.Ct. 719, 38 L.Ed.2d 547, involving certain questions as to the constitutional validity of the Georgia statute from which Ch. 73-120 was patterned.
[3] Id.
[4] Buck v. Gibbs, D.C., 34 F. Supp. 510, mod. 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1940); Hunter v. Owens, 80 Fla. 812, 86 So. 839 (1920); Cragin v. Ocean & Lake Realty Co., 101 Fla. 1324, 133 So. 569, 101 Fla. 1324, 135 So. 795 (1931), appeal dism. 286 U.S. 523, 52 S.Ct. 494, 76 L.Ed. 1267; Haworth v. Chapman, 113 Fla. 591, 152 So. 663 (1933); Hanson v. State, 56 So.2d 129 (Fla. 1952); Overstreet v. Blum, 227 So.2d 197 (Fla. 1969); Hancock v. Sapp, 225 So.2d 411 (Fla. 1969); Rich v. Ryals, 212 So.2d 641 (Fla. 1968); Tornillo v. Miami Herald Pub. Co., 287 So.2d 78 (Fla. 1973).
[5] Ervin v. Peninsular Tel. Co., 53 So.2d 647 (Fla. 1951).
[6] Fla. Const., art. II, § 3, F.S.A.
[7] State v. Barquet, 262 So.2d 431 (Fla. 1972); State v. Tindell, 88 So.2d 123 (Fla. 1956); Ervin v. Collins, 85 So.2d 852 (Fla. 1956).
[8] 82 Wash.2d 584, 512 P.2d 1049 (1973).
[9] RCW 9.68.010.